O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONEL ARAMBULA TRUJILLO,<br><br>          Plaintiff,<br><br>          v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>          Respondent. | Case No. CV 15-5468-KES<br><br>MEMORANDUM OPINION AND ORDER |

Plaintiff Leonel Arambula Trujillo appeals the final decision of the Administrative Law Judge ("ALJ") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons discussed below, the Court concludes: (1) the ALJ did not err at step five of the sequential evaluation; and (2) the ALJ gave clear and convincing reasons for discounting Plaintiff's credibility. The ALJ's decision is therefore AFFIRMED.

/ / /

/ / /

## I.

## BACKGROUND

On August 1, 2011, Plaintiff filed applications for DIB and SSI, alleging disability beginning on March 1, 2010. Administrative Record ("AR") 161-74. Plaintiff alleges that he is unable to work due to lower back injury, left elbow injury, and knee injury. AR 196.

On October 9, 2013, an ALJ conducted a hearing, at which Plaintiff, who chose to appear and testify without the assistance of an attorney or other representative, appeared and testified. AR 44-51. A vocational expert ("VE") also testified. AR 52-54. The ALJ left the record open for 10 days to allow Plaintiff the opportunity to submit a list of additional providers for the Office of Disability Adjudication and Review staff to obtain additional medical evidence. AR 20, 43-44, 55. Plaintiff submitted the list, and new medical evidence was submitted and incorporated into the record. AR 20, 1062-76.

On December 23, 2013, the ALJ issued a written decision denying Plaintiff's request for benefits. AR 20-30. The ALJ found that Plaintiff had the severe impairments of "left elbow injury, status post two corrective surgeries (March 2008 – ORIF[1] and March 2009 – capsular release with excision of humerus); cervical protrusions; and lumbar disc desiccation at L4-L5 and L5-S1." AR 22. Notwithstanding Plaintiff's impairments, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, except that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; stand for 6 hours in an eight-hour

---

[1] An open reduction internal fixation ("ORIF") refers to a surgical procedure to fix a severe bone fracture by realigning the broken bone into the normal position. See www.orthopaedics.com.sg/treatments.

workday; sit for 6 hours in an eight-hour workday; occasionally bend or stoop; and occasionally use the non-dominant left arm for fine manipulation, gross manipulation, and reaching in all directions. AR 23. The ALJ determined that Plaintiff was unable to perform any past relevant work, but there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. AR 28-29. The ALJ thus found that Plaintiff was not disabled. AR 30.

## II.
## ISSUES PRESENTED

The parties dispute whether the ALJ erred in:

(1) relying on the VE's testimony at step five; and

(2) discounting Plaintiff's testimony concerning the intensity, persistence and limiting effects of his symptoms.

## III.
## DISCUSSION

**A.  The ALJ Properly Relied on the VE's Testimony at Step Five.**

Plaintiff contends that the ALJ erred in relying on the VE's testimony at step five. Specifically, Plaintiff alleges: (1) the requirements of the ticket taker job as set forth in the Dictionary of Occupational Titles ("DOT") include frequent reaching and handling and, therefore, the job is inconsistent with his RFC, which limited him to only occasional reaching and handling; and (2) the VE made a mistake in citing the number of jobs available for the usher job. Dkt. 19 at 4-10.

At step five, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in significant numbers in the national or regional economy, taking into account the claimant's RFC, age, education, and work experience. Tackett v. Apfel, 180 F.3d 1094, 1100 (9th Cir. 1999); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c). An ALJ may

satisfy that burden by asking a VE a hypothetical question reflecting all the claimant's limitations that are supported by the record. Hill v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012); see Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002). In order to rely on a VE's testimony regarding the requirements of a particular job, an ALJ must inquire whether his testimony conflicts with the DOT. Massachi v. Astrue, 486 F.3d 1149, 1152-53 (9th Cir. 2007) (citing SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000)[2]). When such a conflict exists, the ALJ may accept VE testimony that contradicts the DOT only if the record contains "persuasive evidence to support the deviation." Pinto v. Massanari, 249 F.3d 840, 846 (9th Cir. 2001) (internal quotation marks omitted); see also Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008).

### 1. Ticket taker

Here, the ALJ asked the VE a hypothetical question incorporating all of the limitations found in the RFC, including the limitation of occasional reaching and handling by the non-dominant left arm. AR 52. The VE testified that an individual with Plaintiff's age, education, work experience and RFC

---

[2] SSR 00-4p provides in relevant part, "Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information."

could perform such jobs as ticket taker and usher. AR 53. The VE further testified that such a person who had no use of the non-dominant left arm would be precluded from "all work." Id. When the ALJ asked if the VE's testimony varied from the DOT, the VE stated: "Only as it relates to how the work was actually performed and that was based on the record." AR 54.

In his written decision, the ALJ reported that he had determined that the VE's testimony was consistent with the DOT, and he adopted the VE's findings. AR 30.

The DOT indicates that the ticket taker job requires reaching and handling "frequently," but the DOT does not expressly state whether both hands must be used. See DOT 344.667-010. Plaintiff argues that the ticket taker job exceeds his occasional reaching and handling limitations and, because the ALJ failed to identify and obtain a reasonable explanation from the VE regarding this deviation from the DOT, reversal is warranted. Dkt. 19 at 6. The Commissioner argues that "the DOT does not specify whether it requires frequent reaching and handling with both arms," and the VE "properly considered this" and then testified that the job could be performed with this limitation. Dkt. 19 at 11.

The Court finds that there is no conflict between the DOT job description for the ticket taker job and the VE's testimony or Plaintiff's RFC. Courts have routinely held that jobs requiring reaching, handling or fingering do not necessarily involve the use of both hands. See, e.g., Pierre v. Colvin, 2016 WL 492430, at *2 (C.D. Cal. Feb. 5, 2016) (finding no conflict where VE testified that a person with claimant's limitations, requiring the use of a cane for ambulation, could perform the identified job, which required constant reaching, handling, and fingering); Barrett v. Colvin, 2015 WL 5796996, at *5 (C.D. Cal. Oct. 1, 2015) (finding no conflict where claimant had to use a cane and the DOT job descriptions did not require the continual use of both hands);

5

Gutierrez v. Astrue, 2012 WL 234366, at *2 (C.D. Cal. Jan. 24, 2012) ("[G]enerally speaking, the requirement [in the DOT] that an employee frequently use his hands to perform a job does not mean that he has to be able to use both hands.") (citing Carey v. Apfel, 230 F.3d 131, 146 (5th Cir. 2000) (holding vocational expert's testimony that claimant, whose left arm had been amputated, could perform work as cashier or ticket seller was not inconsistent with DOT requirement of occasional or frequent handling and fingering where DOT did not specifically require use of both hands)).

Even assuming an apparent conflict with the DOT,[3] the conflict was resolved by the VE's testimony that the ticket taker job could be performed with only occasional use of the non-dominant arm. AR 53. The VE's testimony constitutes substantial evidence supporting the ALJ's determination that Plaintiff could perform the ticket taker job. Tackett, 180 F.3d at 1101. Even assuming error, any error is harmless because Plaintiff could still perform the usher job, which requires only occasional reaching and handling. See DOT 344.677-014; see also Dkt. 19 at 7-8 (conceding that "the functional limitations assessed by the ALJ are in line with the DOT's description of the [usher] occupation"). Accordingly, remand is not warranted on this issue.

**2.     Usher**

---

[3]     At least one court has recognized "a split of authority as to whether there is a conflict between a DOT job description requiring some level of 'reaching,' and VE testimony that a hypothetical person who is limited in his ability to reach as to one arm can perform that job." Reese v. Astrue, 2012 WL 137567, at *6 n.10 (C.D. Cal. Jan. 17, 2012) (comparing Marshall v. Astrue, 2010 WL 841252, at *6 (S.D. Cal. Mar. 10, 2010), Meyer v. Astrue, 2010 WL 3943519, at *8-9 (E.D. Cal. Oct. 1, 2010), and Wallis v. Astrue, 2010 WL 5672742, at *5 (S.D.W. Va. Dec. 20, 2010), with Fuller v. Astrue, 2009 WL 4980273, at *2-3 (C.D. Cal. Dec. 15, 2009), and Diehl v. Barnhart, 357 F. Supp. 2d 804, 822 (E.D. Pa. 2005)).

Plaintiff argues that the VE provided an inaccurate number of jobs available for the usher position, and therefore the VE's testimony could not serve as substantial evidence supporting the ALJ's determination at step five that the usher job existed in significant numbers. Dkt. 19 at 8.

At the hearing, the VE testified that there were 10,000 usher jobs in California and 105,000 usher jobs nationally. AR 53. Plaintiff does not argue that the numbers cited are not significant numbers, but instead argues that "[i]t appears that the [VE] cited to the number of jobs in the entire [Occupational Employment Survey] statistical group, instead of the individual DOT code [for usher]." Dkt. 19 at 8. Plaintiff contends that the statistical group includes ticket taker, press-box custodian, drive-in theater attendant, children's attendant, and usher. Id. Plaintiff argues that in 2013, there existed 18,647 usher jobs in the nation and 2,563 usher jobs in California, and the ALJ did not find 18,647 national jobs constitutes a significant number. Id. at 8-9. In support, Plaintiff cites Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 529 (9th Cir. 2014), where the Ninth Circuit stated that 25,000 national jobs presented a "close call" with regards to whether the number of jobs available constituted a significant number. Id. at 9. The Commissioner argues that even assuming that the number of jobs identified by Plaintiff is correct, the number of regional jobs available constitutes a significant number of jobs, and any error would be harmless. Id. at 12-13 (citing Gutierrez, 740 F.3d at 524-29; Yelovich v. Colvin, 532 F. App'x 700, 702 (9th Cir. 2013); Allison v. Astrue, 425 F. App'x 636, 640 (9th Cir. 2011)).

"This Circuit has never clearly established the minimum number of jobs necessary to constitute a 'significant number.'" Barker v. Sec'y of Health & Human Servs. 882 F.2d 1474, 1478 (9th Cir. 1989). The Social Security Regulations state that the Commissioner is to consider whether significant numbers exist "either in the region where [claimant lives] or in several other

regions of the country." 20 C.F.R. §§ 404.1566(a) & 416.966(a). In other words, the "significant" number of jobs can be "either regional jobs (the region where a claimant resides) or in several regions of the country (national jobs), and if either of the two numbers is "significant," the ALJ's decision must be upheld. Gutierrez, 740 F.3d at 523-24 (quoting Beltran v. Astrue, 700 F.3d 386, 389-90 (9th Cir. 2012)) (emphasis in original).

Plaintiff does not contend that 2,563 jobs in California is an insufficient number of regional jobs. Dkt. 19, at 8-9, 15-18. As the Commissioner argues, the Ninth Circuit has found that "2,500 jobs constituted significant work in the region of California." Id. at 13 (quoting Gutierrez, 740 F.3d at 527); see also Yelovich v. Colvin, 532 F. App'x 700, 702 (9th Cir. 2013) ("900 regional document preparer jobs is similar to numbers we have found 'significant' in the past"); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (1,000 to 1,500 jobs in the local area was a significant number); Peck v. Colvin, 2013 WL 3121280, at *5 (C.D. Cal. June 19, 2013) (1,400 jobs in California and 14,000 in the nation significant). Furthermore, Plaintiff has failed to establish that 18,647 national jobs does not constitute a significant number of jobs. See Yepiz v. Colvin, 2013 WL 1339450, at *9 (C.D. Cal. Mar. 28, 2013) (15,000 jobs in nation significant); Albidrez v. Astrue, 504 F. Supp. 2d 814, 824 (C.D. Cal. 2007) (1,445 jobs regionally and 17,382 jobs nationally significant). Accordingly, Plaintiff fails to demonstrate reversible error at step five and remand is not warranted on this issue.

**B.      The ALJ Gave Clear and Convincing Reasons for Discounting Plaintiff's Credibility.**

Plaintiff next contends that the ALJ erred in discrediting his complaints of pain and limitation. Dkt. 19 at 18-23, 27. Plaintiff testified that he cannot work because of an injury to his left elbow and lower back. AR 46. He "cannot sleep normal," his left arm "is normally hurting," he cannot do his

8

"normal activities, shower, dress," and cannot lift or use his left arm. AR 47. He feels severe pain "[a]ll of the time" in the left hand and arm, and uses a cream for pain, which "works." AR 48-49. He also has problems with his neck, both knees, and both wrists. AR 49-50. When the ALJ asked how many pounds he could lift with his left hand, Plaintiff testified: "Probably none." AR 50.

### 1. Applicable Law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009); Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must

provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014). The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

The ALJ may also use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for lying and inconsistencies in his statements or between his statements and his conduct. Smolen, 80 F.3d at 1284; Thomas, 278 F.3d at 958-59.

**2. Analysis**

Following the two-step process outlined above, the ALJ found as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements considering the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.[4]

AR 24.

---

[4] The ALJ's "reasons explained in this decision" are at AR 24-28. The Court has not quoted that discussion in full here, but discusses it in relevant part in the Court's analysis, below.

The ALJ gave three reasons for discounting Plaintiff's credibility: (1) the objective evidence was inconsistent with Plaintiff's testimony regarding the severity and extent of his limitations; (2) Plaintiff's conservative treatment was inconsistent with an alleged inability to perform all work activity; and (3) Plaintiff's daily activities were inconsistent with his alleged degree of impairment. AR 24-28.

        a.    The objective evidence was inconsistent with Plaintiff's testimony regarding the severity and extent of his limitations.

First, the ALJ discounted Plaintiff's credibility on the ground that the objective medical evidence did not support the severity or the extent of his alleged limitations. AR 28. The ALJ noted that the medical evidence showed some physical limitations, but found the "majority of the medical evidence" showed mild to normal findings, inconsistent treatment, and improvement with treatment. Id. Plaintiff contends that "the objective records appear to show deterioration over time." Dkt. 19 at 20.

The ALJ's determination that the objective evidence is inconsistent with Plaintiff's testimony regarding the severity and extent of his limitations is supported by substantial evidence. The ALJ noted that Plaintiff initially injured his left elbow on February 28, 2008, approximately two years prior to the alleged disability onset date. AR 25. Plaintiff had an operation on his left elbow on March 21, 2008, and was released to work by his workers' compensation physician, Dr. Zeman, as of September 22, 2008, as long as he performed no lifting over 10 pounds or overhead lifting. AR 25, 353, 418. A January 28, 2009 MRI of the cervical spine indicated abnormal disc desiccation from C3 through C7, and a 1-2 mm bulge at C4-C5 and C5-C6. AR 855. On February 9, 2009, an EMG nerve conduction study revealed entrapment neuropathy of the median nerve at the left wrist with mild results.

AR 25, 447-48.  On March 27, 2009, Plaintiff had a second operation on his left elbow to improve his range of motion in his elbow.  AR 25, 544.  His range of motion increased and he was released to work as of June 29, 2009, as long as he performed no lifting over 10 pounds and worked no more than 8 hours per day.  AR 25, 528, 551.  In July 2009, Plaintiff reported that while at work, he had to lift and load two doors and lift 40 pound boxes of tile, which aggravated his shoulder.  AR 25, 551.  After he was taken off work because he was lifting more than his restriction, he reported that his wrist was "a little better."  AR 25, 569.  On November 4, 2009, an EMG of the left upper extremity was normal.  AR 855.  On February 26, 2010, Dr. Zeman found no swelling, erythema, scars, muscle atrophy or ecchymosis of the left elbow, but found decreased range of motion, tenderness to palpation, and positive Tinel's.  AR 588.  The EMG of the left elbow and hand/wrist were normal, and Dr. Zeman concluded that Plaintiff had no evidence of compressive peripheral neuropathy.  AR 590.

     On April 9, 2010, a month after the alleged disability onset date, Plaintiff reported that he was feeling better and he could soon return to work.  AR 25, 593.  Dr. Zeman opined that Plaintiff could return to work as of July 1, 2010, with no lifting over 20 pounds and no repetitive overhead lifting, gripping, or grasping.  AR 25, 681-88.  Dr. Zeman also recommended school for retraining so Plaintiff could return to work.  AR 758.  According to the record, Plaintiff stopped treatment with Dr. Zeman as of July 2010, and received no other treatment until January 2013.  AR 26, 1064.  Around this time, Plaintiff stopped taking medication and started using an ointment/cream from Mexico that continues to help his pain.  AR 49, 992.  On August 17, 2010, an MRI of his left wrist indicated no evidence of triangular fibrocartilage tear, fluid surrounding flexor carpi ulnaris, and no evidence of avascular necrosis or degenerative change.  AR 855.  On March 24, 2011, an MRI of the lumbar

spine indicated lumbar disc desiccation and facet degenerative changes at L4-L5 and L5-S1. AR 26, 855.

Dr. Siebold, an Agreed Medical Examiner ("AME") in Plaintiff's workers' compensation case, examined Plaintiff on August 11, 2011. AR 991-1011. Examination of the cervical spine was normal, except for the left lat bend. AR 994. Tinel's test was positive at the left elbow, and there was flexion contraction of the left elbow. Id. Tinel's, Phalen's, and Finkelstein's tests were negative in the bilateral wrists and hands. AR 994-95. There was atrophy in the left arm. AR 995. Dr. Siebold opined the following work restrictions: no very repetitive motion, cervical spine; no very prolonged positioning; no very heavy lifting at or above shoulder level; no repetitive motion, left elbow, and hand wrist with no repetitive fine manipulation and no forceful activities of the left upper extremity; and no heavy lifting and no repetitive stooping/bending of the lumbar spine. AR 26, 1001-05.

On January 31, 2013, Plaintiff began treatment with Dr. Calderone after he re-injured his left upper extremity by carrying a 5-gallon jug of water while looking for work in Arizona.[5] AR 26, 51, 1063-69, 1089. Upon examination, Dr. Calderone noted: gait – normal; neck – no swelling, no deformity, no tenderness to palpation, no discomfort on range of motion; upper extremities – deformity noted throughout the upper extremities bilaterally with no swelling, tenderness to palpation diffusely throughout the left elbow and tenderness to the left wrist, full range of motion of the shoulders, limited range of motion of the left elbow, full range of motion at the left wrist and hand; negative impingement test of the shoulders; positive medial and lateral epicondylar pain

---

[5] Five gallons of fresh water weighs 41.7 pounds. https://www.reference.com/science/much-5-gallons-water-weigh-63e621962c79397e (last visited June 14, 2016).

of the left elbow, and negative Tinel's sign of the bilateral wrists; and back – no swelling or deformity, no tenderness to palpation of the thoracic or lumbar spine, and negative straight leg raise. AR 26, 1065-67. Dr. Calderone diagnosed status post fracture dislocation left elbow with radial head placement biceps tendon and lateral collateral ligament repair; history of left wrist TFCC tear; chronic cervical sprain; and chronic lumbar sprain. AR 1068. He noted that Plaintiff had "increased symptoms" and recommended an updated MRI of the left wrist and cervical spine and CT scan of the left elbow to check the status of radial head replacement. Id.

  Plaintiff had updated MRIs of his left wrist and cervical spine in April 2013. AR 26, 1052-56. The MRI of the left wrist indicated positive ulnar variance, triangular fibrocartilage defect and early changes of arthrosis of the proximal ulnar lunate; no evidence of fracture; and some dorsal soft tissue edema. AR 26, 1053. The MRI of the cervical spine indicated focal central protrusion at C4-5 leading to mild central stenosis; focal central protrusion at C5-6 leading to borderline central stenosis; no evidence of foraminal narrowing at any level; no evidence of fracture; and normal-appearing spinal cord. AR 26, 1055. On May 17, 2013, Dr. Calderone opined that Plaintiff could return to modified work, with the restriction of lifting no greater than 5 pounds. AR 27, 1058-59. On June 14, 2013, and again on November 5, 2013, Dr. Calderone opined that Plaintiff could return to modified work, but could not lift more than 10 pounds. AR 27, 1060-61, 1072-73.

  On September 18, 2013, Dr. Siebold re-examined Plaintiff after not having seen him since August 11, 2011. AR 1088-1144. Plaintiff reported that he had been actively searching for work, although he was "worse" than when he was last seen. AR 1089. He reported that he had used a cane to ambulate since July 2012 because of increased right knee pain, lumbar spine pain, bilateral knees, and bilateral feet. AR 1090. Examination indicated flexion

below normal with complaints at C5 and C7; left lateral elbow extension, flexion, supination, and pronation diminished; Tinel's "questionably positive" at the left elbow; left wrist complaints with decreased range of motion of the 5th digit; negative Phalen's and Tinel's at the left wrist, diminished forward flexion and extension of the lumbar spine; and x-rays indicating anterior spur at C5-C6 and straightening of the normal cervical lordosis; lumbar spine negative for spondylolysis or spondylolisthesis; bilateral positive ulnar variance on the left and right hand and wrist; and some suggestion of degenerative change and spur formation with degenerative change in the humeral ulnar joint in the left elbow. AR 1091-95. Dr. Siebold opined no repetitive motion, no prolonged positioning, and no heavy lifting at or above shoulder level bilaterally; no repetitive motion of the left elbow, hand and wrist with no repetitive fine manipulation; no forceful activities with the upper left extremity; no "substantial work" with the left hand and wrist; and no heavy lifting and no repetitive stooping and bending of the lumbar spine. AR 1137-43.

      Plaintiff argues that Dr. Siebold described "what appears to be some worsening of the MRI" of the cervical spine and noted atrophy of the left arm in September 2013. Id. at 20-21; AR 1137, 1139. Nevertheless, Dr. Siebold opined work restrictions similar to those opined in August 2011, and he did not restrict Plaintiff from all use of his left arm or all work in general. AR 1001-05, 1137-43. Moreover, as discussed above, both Dr. Zeman and Dr. Calderone opined that Plaintiff could return to modified work, which further contradicts Plaintiff's allegations that he was unable to perform any work activity after the alleged disability onset date. AR 681-88, 1058-61, 1072-73.

      To the extent Plaintiff argues that the ALJ erred by not discussing the atrophy of his left arm as noted by Dr. Siebold in September 2013, Plaintiff's argument fails. Dkt. 19 at 21. Dr. Siebold's September 2013 report was submitted by Plaintiff to the Appeals Council on May 22, 2014, after the ALJ's

decision in this matter. AR 1077-1154. Therefore, the ALJ would not have considered Dr. Siebold's September 2013 report. Nevertheless, even though Dr. Siebold noted atrophy of the left arm in 2011, he opined that Plaintiff had use of the left arm, subject to work restrictions. AR 995, 1139. Accordingly, the evidence of atrophy does not, as Plaintiff argues, support Plaintiff's allegation that he cannot lift or use his arm at all. Dkt. 19 at 21; AR 47.

The ALJ set forth a detailed discussion of the objective evidence and could have reasonably found that the majority of the medical evidence did not support Plaintiff's allegations that he was unable to work.

    b. Plaintiff's conservative treatment was inconsistent with an alleged inability to perform all work activity.

Second, the ALJ noted that Plaintiff's treatment history was generally conservative. AR 28. Plaintiff did not use narcotic pain medication since 2010, and did not have further corrective surgeries for his left arm or wrist. AR 28, 49, 992, 1065. Plaintiff treated his pain with Mamisan, a topical cream from Mexico used on horses to cure bones.[6] AR 49, 960. The use of a topical cream is conservative treatment. See Caniglia v. Colvin, 2016 WL 3096806 (C.D. Cal. June 1, 2016); Diaz v. Colvin, 2015 WL 1238024 (C.D. Cal. Mar. 17, 2015). An ALJ may consider evidence of conservative treatment in discounting testimony regarding the severity of an impairment. See Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007). Plaintiff testified that the cream

---

[6] Mamisan appears to be an over-the-counter ointment for inflammation and sore muscles, and is readily available on the internet. See, e.g., https://www.amazon.com/Mamisan-Unguento-100-grams/dp/B004DR5CG8?ie=UTF8&ref_=cm_cr_arp_d_product_top (last visited June 14, 2016); www.ebay.com/itm/OINTMENT-Mamisan-Unguento-100g-Ointment-EXPIRATION-DATE-02-2018-FAST-SHIPPING-/171096332545 (last visited June 14, 2016).


works. AR 49. It is true that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility" for Social Security benefits. Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).

In addition, the ALJ noted "a significant gap in treatment history," and that Plaintiff did not seek any treatment between July 2010 and January 2013, other than a re-examination by AME Dr. Siebold on August 11, 2011. AR 26, 959-87, 1064. In assessing the claimant's credibility, "unexplained, or inadequately explained, failure to seek treatment . . . can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). In the Reply, Plaintiff argues that the ALJ should have inquired into this issue at the hearing, as "[t]here may be several reasons [Plaintiff] did not treat, such as cost or lack of coverage."[7] Dkt. 19 at 27. Other than a reference to a six-month delay in approving a visit to Dr. Calderone after Plaintiff's June 28, 2012 injury, the record lacks evidence showing that the gap in treatment was caused by Plaintiff's lack of ability to pay for treatment. AR 1089; see Orn, 495 F.3d at 638 (9th Cir. 2007) (gaps in treatment do not constitute a clear and convincing reason for discounting credibility if the claimant lacked the financial ability to pay for treatment).

---

[7] Plaintiff relies on Soto-Olarte v. Holder, 555 F.3d 1089, 1092 (9th Cir. 2009), and Campos-Sanchez v. INS, 164 F.3d 448, 450 (9th Cir. 1999), for the proposition that an ALJ must confront a claimant with an inconsistency in testimony, and if an explanation is made, address that explanation. Dkt. 19 at 27. Soto-Olarte and Campos-Sanchez are immigration cases. "[D]istrict courts within the Ninth Circuit have rejected the contention that the rule articulated in Soto-Olarte applies in the social security disability context." Mulay v. Colvin, 2015 WL 1823261, at *6 (C.D. Cal. Apr. 22, 2015) (collecting cases). Plaintiff cites no authority for the proposition that the Soto-Olarte rule applies in adjudicating social security disability appeals.

Furthermore, the record indicates that Plaintiff had been "released" by Dr. Zeman in approximately May 2010, and Plaintiff did not seek further treatment until his June 2012 injury. AR 960, 1089. Under these circumstances, the ALJ properly considered the gap in treatment as part of the credibility determination. See Burch, 400 F.3d at 681 (ALJ properly considered a "three or four month" gap in treatment in discounting claimant's pain testimony).

          c.      The ALJ's reliance on Plaintiff's daily activities was harmless error.

Third, the ALJ discounted Plaintiff's credibility based on his activities of daily living. AR 28.

The ALJ noted that Plaintiff's activities of daily living reveal a person capable of performing some level of substantial gainful activities. AR 28. The ALJ cited Plaintiff's testimony that he was unable to work due to pain and limited ability to reach, and his testimony that he cooks, cleans, watches television, socializes, mows the lawn, drives a car, and can manage his own money. Id.; AR 47-48. Specifically, the ALJ noted that on August 22, 2011, Plaintiff reported that he could walk up to 2 miles, stand for 20 minutes at a time, drive his own car, take public transportation, and do light housekeeping chores without assistance. AR 24, 211-13. On September 1, 2011, Plaintiff reported that he does his own grocery shopping, cleans his room, does laundry once a week, and walks 3 times a day for a mile each time. AR 24, 232-34. On November 15, 2011, Plaintiff reported that he has difficulty putting on his clothes due to his left arm limitations, he prepares simple meals, performs household chores, manages his own money, recycles cans and plastic bottles to pay his bills, and socializes. AR 24, 237-44. The ALJ found that "[t]his sort of activity reveals a claimant who is not in continuous pain, nor incapable of work." AR 28.

The Court finds that the ALJ's description of Plaintiff's daily activities was incomplete, and thus this was not a clear and convincing reason to discount Plaintiff's credibility. On August 22, 2011, Plaintiff stated that he needed assistance with carrying laundry and groceries, picking up the laundry basket, mopping, and cleaning the kitchen. AR 213. On September 1, 2011, Plaintiff stated that although he takes walks 3 times a day, he also lies down 4 times a day for 40 minutes and sleeps 3 times a day for 2 hours. AR 232. He cleans his room and does his laundry once a week. AR 233. On November 15, 2011, Plaintiff stated that he vacuums once a week, but cannot mop or use the lawn mower.[8] AR 239-40. He shops in the store once a week. AR 240. His social activities consist of talking to a few people at the park where he recycles daily and visiting his mother twice a month. AR 241. At the hearing on October 9, 2013, Plaintiff testified that he lives in his car and spends most of his day sitting in his car and sometimes recycling at the park. AR 50. He cannot cook or clean house, he occasionally watches television at his mother's house on the weekends, he goes to the store to buy cold food, and he does not socialize. Id. While Plaintiff's activities suggest some difficulty in functioning, it is not clear that they contradict claims of a totally debilitating impairment. See Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."). However, any error was harmless because the ALJ provided two other valid reasons for discounting Plaintiff's credibility that were each supported by substantial evidence, and were sufficiently clear and convincing. See Burch, 400 F.3d at 681.

---

[8] Plaintiff indicated he could mow the grass on May 1, 2009, which was prior to the alleged disability onset date. AR 498.

On appellate review, this Court is limited to determining whether the ALJ properly identified reasons for discrediting Plaintiff's credibility. Smolen, 80 F.3d at 1284. The lack of supporting objective evidence and conservative treatment were proper and sufficiently specific bases for discounting Plaintiff's claims of disabling symptoms, and the ALJ's reasoning was clear and convincing. See Tommasetti, 533 F.3d at 1039-40; Houghton v. Comm'r Soc. Sec. Admin., 493 F. App'x 843, 845 (9th Cir. 2012). Because the ALJ's findings were supported by substantial evidence, this Court may not engage in second-guessing. See Thomas, 278 F.3d at 959; Fair, 885 F.2d at 604. Remand is therefore not warranted on this issue.

## IV.
## CONCLUSION

For the reasons stated above, the decision of the Social Security Commissioner is AFFIRMED and the action is DISMISSED with prejudice.

Dated: June 20, 2016

*Karen E. Scott*

_____
KAREN E. SCOTT
United States Magistrate Judge